## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

RAE LAZNIK,                                    )
                                               )
            Plaintiff,                         )
                                               )
vs.                                            )        Case No. CIV-05-1474-F
                                               )
SECURITY FINANCE OF                            )
OKLAHOMA, LLC, a Delaware                      )
Limited Liability Company,                     )
                                               )
            Defendant.                         )

## ORDER

Before the court is Defendant's Motion for Summary Judgment, filed October 2, 2006 (doc. no. 38). Plaintiff has responded, defendant has replied and the motion is ready for determination.

Plaintiff, Rae Laznik ("Laznik"), alleges that she was wrongfully discharged from her employment with Security Finance Corporation of Oklahoma, Inc. ("SFC"), in violation of the public policy of the State of Oklahoma. Defendant, Security Finance of Oklahoma, LLC, is successor in interest to SFC. Defendant moves for summary judgment in its favor on Laznik's wrongful discharge claim. Defendant specifically contends that it is entitled to summary judgment because (1) Oklahoma does not recognize the public policy tort of which Laznik complains; (2) Laznik was not discharged by SFC, constructively or otherwise; (3) even assuming Laznik was constructively discharged, there is no evidence that Laznik was discharged by SFC in violation of Oklahoma's public policy; and (4) Laznik is not entitled to damages.

Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Relevant Facts

The following relevant facts are undisputed or viewed in a light most favorable to Laznik.

SFC was in the business of making small consumer loans and had numerous branch offices throughout the State of Oklahoma. Laznik was hired by SFC in May of 1996 as a "floater." As a "floater," Laznik had the same responsibilities as that of an assistant manager. While a "floater," Laznik worked at both branches of SFC in Ponca City, Oklahoma.

Prior to being hired by SFC, Laznik filled out an application for employment. In the application, Laznik indicated that she would be willing to transfer "now or in the future." *See*, Exhibit 1-A to Exhibit 1 of defendant's motion, Application for

Employment.  She also indicated in her interview for employment with SFC that she was willing to relocate.

In January of 2001, Laznik was promoted to manager of SFC's Stillwater branch.  At that time, Laznik signed an employment agreement which contained the following provision:

> Confidential Information.  Employee recognizes that, in the course of his or her employment, Employee will receive certain confidential information relating to the Company's business and its customers. Employee acknowledges that such confidential information is a valuable, special and unique asset of the Company.  Employee shall not, during or after his or her employment by the Company, use or disclose to any other person (other than as may be necessary to perform the Employee's duties hereunder), any trade secrets, including but not limited to: lists of customers, names of prospective customers or other business contacts, training manuals, or any other confidential information, except as expressly authorized in writing by the Company, then Employee will comply strictly with the instructions of Employee's supervisor or other superior officer giving such written instructions.  Employee further acknowledges that all documents, materials and tangible items provided by the Company during Employee's employment, whether or not considered confidential information, are property of the Company. Employee shall promptly return all such items upon termination of his or her employment.

*See*, Exhibit 1-F to Exhibit 1 to defendant's motion, Employment Agreement.

In February of 2002, Laznik called Lisa Burroughs ("Burroughs"), SFC's Vice President of Operations for Oklahoma, to report that she was aware that Jimi Flatt, a manager at SFC's Cushing branch, had been speaking with Tom Adelson ("Adelson"), an attorney, about SFC's collection policy and procedures.

Laznik sent a memorandum, dated February 21, 2002, describing her knowledge of the contacts between Flatt and Adelson.  In the memorandum, Laznik stated that Flatt had called her and told her that she had been talking with Adelson "about the fact that she felt that some of her customers could not afford to pay and that

he could help them out." *See*, Exhibit 1-G to Exhibit 1 to defendant's motion; Exhibit 1 to plaintiff's response.   These customers included Margaret Winton and her daughter.  The memorandum also stated that Laznik had been contacted by Adelson on February 4, 2002 about appearing on an OETA documentary and that she had told Adelson that she "was not interested then and would not be at any time in the future." *See*, *id*.

Prior to the telephone conversation, Burroughs knew that Laznik had previously met Adelson at a function in Tulsa.  *See,* Exhibit 3 to plaintiff's response, Burroughs deposition, p. 22, ll. 19-25, p. 23, ll. 1-3.  Burroughs knew that Adelson had some association or affiliation with Stephen Dow, a consumer advocate.  *Id.*, p. 20, ll. 16-20, p. 22, ll. 2-9,

Shortly after receiving the memorandum, Burroughs questioned Flatt as to whether she had had any contact with Adelson.  Flatt denied any such contact.  *See*, Exhibit 3 to plaintiff's response, Burroughs deposition, p. 29, ll. 1-4.  Burroughs asked Flatt if she had any concerns about some of her customers who were unable to pay their loans.  She did tell Burroughs about some customers that she was concerned about but did not mention the Wintons.  *Id*., p. 29, ll. 12-13.

On February 11, 2002, Adelson filed a lawsuit entitled, <u>Gary Gilbert, as guardian for John E. Gilbert, an incapacitated person v. Security Finance Corporation of Oklahoma, Inc. et al.</u>, Case No. CJ-2002-00807, in the District Court for Tulsa County, Oklahoma.  On April 12, 2002, Adelson filed a second lawsuit entitled, <u>Margaret Winton, Delberta Winton and Rose Winton, all incapacitated persons, by and through their sister and aunt and next friend, Melda Rossiter v. Security Finance Corporation of Oklahoma, Inc.</u>, Case No. CJ-2002-237, in the District Court for Payne County, Oklahoma.  Both suits involved tort claims arising out of consumer loan transactions.

After the filing of the Winton lawsuit, Burroughs decided to conduct a further investigation into Laznik's report. Flatt was suspended with pay for seven weeks. Flatt ultimately verified her contact with Adelson and Burroughs reinstated her, under a record of warning. Flatt was not subject to a demotion.

Burroughs received information from Flatt and Laznik's co-worker Billie Cox ("Cox") that Laznik had more contact with Adelson than reported in the February memorandum. Based on what Cox told her, Burroughs believed that Laznik had had "pretty extensive contacts" with Adelson. *See*, Exhibit 3 to plaintiff's response, Burroughs deposition, p. 34, ll. 12-17, p. 56, ll. 14-25, p. 57, l. 1.

Burroughs received information from Dara Hale ("Hale"), a SFC supervisor, about a telephone call that had been placed to Adelson's office by the SFC Stillwater branch on December 7, 2001. The telephone call lasted less than a minute. Burroughs also received information about a demand letter dated December 20, 2001 sent to SFC's Stillwater branch by Adelson.

In April of 2002, Burroughs instructed Laznik to meet her at the Best Western Motel in Stillwater. SFC's counsel was present at the meeting and informed Laznik that she was conducting an investigation for SFC. SFC's counsel questioned Laznik for about three hours. More than half of the questions had some connection to Adelson. According to Laznik, she told SFC's counsel and Burroughs that she had been in contact with Adelson on more than one occasion and that he had asked about SFC's loan practices and procedures. She, however, did not give Adelson any information about a specific customer.

After the April 2002 meeting, Burroughs did not believe Laznik was being truthful. *See*, Exhibit 3 to plaintiff's response, Burroughs deposition, p. 70, ll. 2-5.

On June 5, 2002, Burroughs asked Laznik to come to the Stillwater Holiday Inn for another meeting. Burroughs testified that she could not recall what prompted the meeting. *See*, Exhibit 3 to plaintiff's response, p. 73, ll. 24-25, p. 74, ll. 1. SFC's

counsel was again present and asked Laznik questions for about two hours.  When Laznik asked for a reason for the meeting, she was told that SFC was conducting an investigation.

According to Burroughs, nothing was learned in the Holiday Inn meeting that she had not already learned in the Best Western meeting.  *See*, Exhibit 3 to plaintiff's response, Burroughs deposition, p. 76, ll. 4-9.  After the Holiday Inn meeting was concluded, Burroughs instructed Laznik to hand over all of her office and bank keys.  When Laznik was asked if she was fired, Burroughs told her "No, come to work tomorrow."  *See*, Exhibit 2 to plaintiff's response, Affidavit of Rae Laznik, ¶ 9.

The next day, June 6, 2002, shortly after Laznik arrived for work, Burroughs and Hale took Laznik to the coffee shop next door and told her she was suspended with pay pending an investigation.

In December 2002, Burroughs became aware of a letter dated December 12, 2002 by Adelson (obtained through discovery proceedings in the Adelson lawsuits), wherein Adelson identified Laznik as an employee of SFC with whom he had communicated.  In addition to Laznik, the letter identified Flatt and 17 other current or former employees.

In October of 2003, SFC's general counsel sent Laznik a letter advising that SFC had been unable to contact her by telephone and instructing her to contact SFC supervisor Caroleen Toth ("Toth") for a meeting regarding her employment.  Toth and Laznik arranged for a meeting at the Best Western Motel in Stillwater.  Present at the meeting were two attorneys representing SFC.  They  informed Laznik that they were there to take a sworn statement from her.  Once it was discovered that Laznik had hired counsel, the sworn statement was not taken.

Laznik was deposed on October 27, 2004 about matters related to the state court lawsuits filed by Adelson.  Prior to the deposition, SFC's counsel met with Laznik and her counsel.  SFC's counsel told Laznik to answer the question asked and to tell the

truth.  SFC's counsel also told Laznik to remember she was an employee of SFC. Laznik understood the instruction to mean that she was "to keep in mind the company's best interest while testifying."  *See*, Exhibit 2 to plaintiff's response, Affidavit of Rae Laznik, ¶ 16.

During the deposition, Laznik testified about several contacts she had with Adelson during the winter of 2001-2002.  During these contacts, Laznik discussed policies and procedures of SFC, including collection of loans and places that she had gone to collect payment.  According to Laznik, she told Burroughs of all of her contacts with Adelson, with the exception of a meeting in Tulsa, at the motel meetings in April and June of 2002.  As to the Tulsa meeting, Laznik could not recall whether she had told Burroughs about that contact.

Laznik, during the deposition, also testified about concerns she had about the ability of Margaret Winton, one of the plaintiffs in the <u>Winton</u> lawsuit, to understand her loan transaction.  She also identified other customers about whom she had the same reservations and testified generally that she had such reservations in the case of about 1 out of every 50 customers.  She also testified that Flatt had told her that the Wintons had no utilities, but that SFC expected customers to make their loan payments, even if making the payment left them with insufficient funds to pay their utilities.  She also described the training she received in "selling" loan renewal and identified her supervisor as someone who had picked up loan payments at a homeless shelter.

The <u>Gilbert</u> action was set for jury trial commencing on Monday, November 15, 2004.  Laznik was served with a trial subpoena ordering her to appear at 9:00 a.m. on that date.

On Friday, November 12, 2004, Burroughs and Linda Clinton, a SFC supervisor, met with Laznik at a Cracker Barrel Restaurant located in Oklahoma City, Oklahoma.  During the meeting, Burroughs informed Laznik that SFC had completed

its investigation and was returning Laznik to work under the following circumstances: (1) Laznik was reassigned to a SFC branch in Ponca City; (2) Laznik was being demoted to assistant manager and that her pay would be reduced to $10 an hour plus a $150 per month car allowance; and (3) Laznik was being placed on probation for six months and at the end of that period her performance and the company's needs would be assessed to determine the status of her future with SFC.  Burroughs told Laznik, during the conversation, that the judgment she used in deciding to speak to Adelson was not good judgment, that SFC was not sure whether it would want an individual who uses such judgment in management status and that Burroughs did not feel Laznik had been truthful about her contact with Adelson.  According to Laznik, when she asked why SFC was doing this to her, Burroughs told her that it was because she had "talked" to counsel in the Gilbert lawsuit.  *See*, Exhibit 2 to plaintiff's response, ¶ 18.

The gross pay for the assistant manager position at SFC's Ponca City branch would have been half, or less, of Laznik's pay as manager of SFC's Stillwater branch. She would not be a salaried employee.  The position would have required Laznik to commute approximately two hours each day.  As the assistant manager, Laznik could no longer approve loans.  She would have to spend three or more hours a day collecting loans.

After 2½ years of suspension, Burroughs informed Laznik that she was required to report for work on Tuesday, November 16, 2004.  Laznik informed Burroughs and Clinton that she was unable to report to work because of the trial subpoena. Burroughs informed Laznik that she did not need to show up at trial because SFC's counsel had made arrangements for her to be on call.

Burroughs memorialized the meeting in a letter dated November 12, 2004. Burroughs informed Laznik that if she should fail to report to work on Tuesday, November 16, 2004, she and Clinton would assume Laznik was resigning her position with SFC.

On Tuesday, November 16, 2004, Laznik appeared at the Tulsa County Courthouse to testify for the <u>Gilbert</u> action.  She notified counsel of her appearance. Thereafter, at counsel's request, she executed a document agreeing to voluntarily return if called to testify.  Laznik, however, was not called to testify in the <u>Gilbert</u> action.

Laznik did not appear for work on November 16, 2004.

During her suspension, Laznik submitted an application for employment with Collections, Inc.  She was employed full-time by Collections, Inc. from August 12, 2002 until the middle of October, 2002.

<u>Discussion</u>

"The doctrine of employment-at-will is firmly embedded in the common law of Oklahoma." <u>McCrady v. Oklahoma Department of Public Safety</u>, 122 P.3d 473, 474 (Okla. 2005) (citing <u>Collier v. Insignia Financial Group</u>, 981 P.2d 321, 323 (Okla. 1999)).  Under the doctrine, an employer has the freedom to terminate the at-will employee for any reason or no reason without incurring liability to the employee.  *Id.* at 475.

In <u>Burk v. K-Mart Corp.</u>, 770 P.2d 24 (Okla. 1989), the Supreme Court created an exception to the doctrine, restricting the right of an employer to discharge an at-will employee when that termination is in contravention of a clear mandate of public policy, as articulated by constitutional, statutory or decisional law.  *Id.* at 28: <u>McCrady</u>, 122 P.3d at 475.  The exception subjects the employer to tort liability where the at-will employee is "discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." <u>Burk</u>, 770 P.2d at 29; <u>McCrady</u>, 122 P.3d at 475.  It applies only to a narrow class of cases and must be tightly circumscribed. <u>Burk</u>, 770 P.d at 28-29; <u>McCrady</u>, 122 P.3d at 475.

In order to prevail in an action brought for a wrongful discharge in violation of Oklahoma's public policy, a plaintiff must first identify an Oklahoma public policy goal that is clear and compelling and articulated in existing constitutional, statutory or jurisprudential law. <u>McCrady</u>, 122 P.3d at 475. The determination of public policy is a question of law to be resolved by the court. *Id*.; *see also,* <u>Hayes v. Eateries, Inc.</u>, 905 P.2d 778, 785 (Okla. 1995).

<u>Identification of Public Policy Goal</u>

Defendant contends that it is entitled to summary judgment because Laznik cites no clear or compelling public policy articulated by state constitutional, statutory or decisional law that would allow a claim of wrongful discharge in violation of Oklahoma's public policy. Although Laznik, in support of her claim, relies upon two criminal statutes, 21 O.S. § 455 and 546,[1] defendant contends that these statutes are too general in nature to support a public policy claim. Moreover, defendant contends that Oklahoma has not recognized a public policy claim based upon Title 21 of the Oklahoma statutes. Plaintiff argues that the criminal statutes do support her claim. However, she also urges that Oklahoma decisional law supports her claim, citing <u>Cooper v. Parker-Hughey, M.D.</u>, 894 P.2d 1096 (Okla. 1995). In <u>Cooper</u>, the Oklahoma Supreme Court held that a witness who has testified in a judicial proceeding is absolutely immune from liability for damages resulting from the

---

[1] Section 455(B) provides in pertinent part:

> Every person who . . . harasses any person . . . because of testimony given by such person in any civil . . . proceeding, . . . is, upon conviction, guilty of a felony . . . .

Section 546 provides in pertinent part:

> Every person who maliciously practices any deceit or fraud, or uses any threat menace or violation, with the intent to prevent any party to an action or proceeding . . . from procuring the attendance or testimony of any witness therein . . . .

testimony.  In arriving at its decision, the Oklahoma Supreme Court quoted from the United States Supreme Court's decision in <u>Briscoe v. LaHue</u>, 460 U.S. 325 (1983), including the Court's articulation of public policy with regard to judicial testimony:

> In damages suits against witnesses, the claims of the individual must yield to the dictates of *public policy*, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible.

<u>Cooper</u>, 894 P.2d at 1098 (quotations omitted) (emphasis added).  The Oklahoma Supreme Court also explained that the United States Supreme Court had further indicated in <u>Briscoe</u> that the policy behind absolute witness immunity is to protect the judicial process.  Agreeing with the United States Supreme Court, the Oklahoma Supreme Court concluded that "witness immunity best serves the judicial system and the greater public interest of keeping the 'paths which lead to the ascertainment of truth . . . as free and unobstructed as possible.'"

In addition to 21 O.S. § 455 and § 546, the court notes that 21 O.S. § 1265.6 also provides in pertinent part:

> [N]o person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may so testify . . . and no testimony so given . . . shall be received against him, upon any criminal investigation, proceeding or trial, except upon a prosecution for perjury or contempt of court based upon the giving . . . of such testimony.

The court further notes that 21 O.S. § 491 provides:

> Whoever, in a trial, hearing, investigation, deposition, certification or declaration, in which the making or subscribing of a statement is required or authorized by law, makes or subscribes a statement under oath, affirmation or other legally binding assertion that the statement is true, when in fact the witness or declarant does not believe that the statement is true or knows that it is not true or intends thereby to avoid or obstruct the ascertainment of the truth, is guilty of perjury.

The court need not decide whether <u>Cooper</u> provides sufficient jurisprudential support for Laznik's public policy claim.[2] The court concludes that sections 455, 491, 546 and 1265.6 of Title 21 provide sufficient statutory support for public policy of protecting persons providing or intending to provide truthful testimony in relation to a trial proceeding.

In reaching this conclusion, the court notes that the Tenth Circuit in <u>Bishop v. Fed. Intermediate Credit Bank of Wichita</u>, 908 F.2d 658, 662 (10th Cir. 1990), concluded that the Oklahoma Supreme Court would recognize a <u>Burk</u> tort claim for termination of an employee for testifying truthfully in a congressional hearing.  The Tenth Circuit, in so concluding, stated "[r]ecognition of the exception supports our tradition of free, direct and truthful testimony at legislative hearings, a policy Oklahoma has implicitly recognized." *Id*. at 662.  The court then cited 12 O.S. § 411 (1988), which provided that "[n]o testimony given by a witness . . . before any committee . . . shall be used as evidence in any criminal proceeding against him in any court. . . ."  The language of § 1265.6 is similar to § 411.  The Tenth Circuit also stated that truthful testimony at congressional hearings is "'an act consistent with a clear and compelling public policy' that justifies a public policy exception to the at-will employment doctrine."  *Id*. at 663.

The court is also persuaded by cases from other jurisdictions that have held that the dismissal of an employee because the employee has given or may be called to give truthful testimony in a legal proceeding is contrary to public policy as expressed in similar criminal and other statutes.  *See*, <u>Reust v. Alaska Petroleum Contractors, Inc.</u>, 127 P.3d 807, 813 (Alaska 2005) (Based upon criminal and other statutes, "there is an actionable public policy tort in Alaska for retaliation against witnesses in legal

---

[2]The court notes that there is no allegation in this case that Laznik testified or intended to testify falsely.

proceedings."); Fitzgerald v. Salsbury Chem. Inc., 613 N.W. 2d 275, 286 (Iowa 2000) ("[W]e find ample statutory support for a public policy in Iowa in favor of refusing to commit perjury . . . . [T]his public policy is not simply confined to the refusal to commit perjury but clearly embraces a broader public policy to provide truthful testimony in legal proceedings.") (internal citation omitted); Page v. Columbia Natural Resources, Inc., 480 S.E.2d 817, 825-826 (1996) (Based upon state criminal statutes prohibiting "wilful perjury and false swearing [or] procuring another to do so" and prohibiting "intimidating or impeding any witness [ ] or attempting to obstruct or impede the administration of justice in any court," "it is against substantial public policy of West Virginia to discharge an at-will employee because such employee has given or may be called to give truthful testimony in a legal action."); Freeman v. McKellar, 795 F. Supp. 733, 742 (E.D. Pa. 1992) (State criminal statutes prohibiting perjury, prohibiting intimidation of a witness to give false testimony and prohibiting retaliation against witnesses "reflect a sufficiently clear and significant public policy against deterring persons from providing truthful testimony . . . to trigger the narrow exception to the employment at-will doctrine."); Ressler v. Humane Society of Grand Forks, 480 N.W. 2d 429, 432 (N.D. 1992) ("[A] retaliatory discharge of an employee for honoring a subpoena and testifying truthfully would violate public policy in North Dakota. That public policy is expressed by our Legislature in our criminal statutes prohibiting the failure to obey a subpoena, the refusal to testify, and the making of a false statement. Those statutes evidence a clear and compelling public policy which goes to the very heart of our judicial system.")        The court finds that an employee's truthful testimony or intent to provide truthful testimony is an act consistent with clear and compelling public policy articulated in Oklahoma's statutory law. The court also finds that an employer's discharge of an employee for  testifying truthfully or intending to testify truthfully in legal proceedings would contravene clearly-established public policy as articulated in Oklahoma statutory law. The court

therefore concludes that defendant is not entitled to summary judgment on the basis of Laznik's failure to identify clear and compelling public policy articulated in state constitutional, statutory or decisional law.

Constructive Discharge

Defendant also contends that it is entitled to summary judgment on Laznik's wrongful discharge claim on the basis that she cannot show that she was discharged by SFC, constructively or otherwise.  A discharge, for purposes of wrongful discharge claim, may be either actual or constructive.  Clinton v. State ex rel. Logan County Election Bd., 29 P.3d 543, 546 (Okla. 2001).  According to defendant, the evidence in the record establishes that Laznik voluntarily abandoned her employment with SFC. Although Laznik claims she was constructively discharged because SFC demoted her from her position as manager of SFC's Stillwater branch to a $10 per hour position as assistant manager in SFC's Ponca City branch, defendant contends that Laznik fails to set forth any evidence demonstrating that her working conditions became so intolerable that she had no choice to quit.

A constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to be so intolerable that the employee has no other choice but to quit.  MacKenzie v. City and County of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005).  A finding of constructive discharge depends upon whether a reasonable person would view the working conditions as intolerable, not upon the subjective view of the employee.  Id.

"A perceived demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify [a] finding of constructive discharge."  James v. Sears, Roebuck and Co., Inc., 21 F.3d 989, 993 (10th Cir. 1994).

Viewing the evidence and inferences therefrom in a light most favorable to Laznik, the court concludes that a genuine issue of fact exists as to whether Laznik

was constructively discharged by SFC's actions.[3]  The court therefore concludes that summary judgment is not appropriate on the issue of whether Laznik was discharged by SFC.

Violation of Public Policy

Defendant further contends that Laznik cannot prevail on her wrongful discharge claim because she cannot demonstrate that her alleged constructive discharge violated Oklahoma's public policy.  According to defendant, Laznik has failed to produce evidence to establish that she was constructively discharged as a result of her deposition testimony or to prevent her from giving testimony at the Gilbert trial.

Viewing the evidence and inferences therefrom in a light most favorable to Laznik, the court concludes that Laznik's constructive discharge claim must be resolved by the trier of fact.  Laznik has presented sufficient evidence to raise a genuine issue of fact as to whether the articulated legitimate reason for SFC's employment decision was pretextual.

Damages

Defendant further contends Laznik is not entitled to damages for her claim because she failed to mitigate her damages by resigning her position with Collections, Inc.  The court disagrees.  Laznik's employment with Collections, Inc. occurred prior to her discharge.  The duty to seek other employment did not arise until after her discharge.  Levy v. Tharrington, 62 P.2d 641, 642 (Okla. 1936).  Although defendant also argues that Laznik's employment with Collections, Inc. constitutes a constructive abandonment of her job at SFC and requires a finding that she can recover no

---

[3]For summary judgment purposes, the court need not decide whether evidence of plaintiff's demotion from manager to assistant manager in 1999 is admissible.  Even assuming the evidence is admissible, the court still concludes on the record before it that a genuine issue of fact exists as to whether plaintiff was constructively discharged by SFC's action.

damages, defendant has not cited any authority to support this position.  The court concludes that defendant has failed to demonstrate, as a matter of law, that Laznik's employment with Collections, Inc., resulted in a constructive abandonment of her employment with SFC.  The court therefore concludes that defendant is not entitled to summary judgment on the issue of Laznik's entitlement to damages.

Conclusion

Based upon the foregoing, Defendant's Motion for Summary Judgment, filed October 2, 2006 (doc. no. 38), is **DENIED**.

Dated this 5th day of April, 2007.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

05-1474p011(pub).wpd

-16-